DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
By:     THANE REHN
        Assistant United States Attorney
        One St. Andrew's Plaza
        New York, New York 10007
        (212) 637-2354

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

                 Plaintiff,

      -v.-

$5,379,876.94 IN UNITED STATES
CURRENCY FORMERLY ON DEPOSIT IN
SUNFLOWER BANK, N.A. ACCOUNT
1101996560, HELD IN THE NAME OF "OFAC
BLOCKED ACCOUNT MALOFEYEV,"

           Defendant-*in-rem*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

 

**VERIFIED CIVIL COMPLAINT
FOR FORFEITURE**

22 Civ.  _____

Plaintiff United States of America, by its attorney, Damian Williams, United

States Attorney for the Southern District of New York, for its verified civil complaint, alleges,

upon information and belief, as follows:

## I.  **JURISDICTION AND VENUE**

      1.     This action is brought pursuant to Title 18, United States Code, Section

981(a)(1)(C) by the United States of America seeking the forfeiture of the following:

a.      $5,379,876.94 in United States currency formerly on deposit in Sunflower Bank, N.A. Account 1101996560, held in the name of "OFAC Blocked Account Malofeyev" (the "Defendant-*in-rem*").

2.      This Court has original jurisdiction over this forfeiture action pursuant to Title 28, United States Code, Sections 1345 and 1355.

3.      Venue is proper pursuant to Title 28, United States Code, Section 1395 because the Defendant-*in-rem* is located within the judicial district for the Southern District of New York. Venue is also proper pursuant to Title 28, United States Code, Section 1355 (b)(1)(A) because some of the acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

4.      As set forth below, there is probable cause to believe that the Defendant-*in-rem* is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) as proceeds of violations of 50 U.S.C. § 1705, Executive Orders 13660, 13661, and 13662, and Title 31, Code of Federal Regulations § 589.201 (the International Emergency Economic Powers Act ("IEEPA") and orders and regulations issued thereunder pertaining to the national emergency with respect to Ukraine) (the "Subject Offenses").

## II.   PROBABLE CAUSE FOR FORFEITURE

### Legal Background as to the Subject Offenses

5.      By virtue of the IEEPA, Title 50, United States Code, Sections 1701-08, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.   *See* 50 U.S.C. §§ 1701, 1702.

6.     Pursuant to the IEEPA, "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime.   50 U.S.C. § 1705(a), (c).

7.     In 2014, pursuant to his authorities under the IEEPA, the President issued Executive Order 13660, which declared a national emergency with respect to the situation in Ukraine.   *See* Exec. Order No. 13660 (Mar. 6, 2014), 79 Fed. Reg. 13493 (Mar. 10, 2014). Specifically, Executive Order 13660 found that the actions and policies of certain persons, including persons who have asserted governmental authority in the Crimean region without the authorization of the Government of Ukraine—which undermine democratic processes and institutions in Ukraine; threaten its peace, security, stability, sovereignty, and territorial integrity; and contribute to the misappropriation of its assets—constitute an unusual and extraordinary threat to the national security and foreign policy of the United States.   *See id.* at 13493.   To address this national emergency, the Executive Order blocked all property and interests in property that were then or thereafter came within the United States or the possession or control of any United States person, of individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria.   *See id.* § 1.   These criteria include, but are not limited to, individuals determined to be responsible for or complicit in, or who engage in, actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine, or who materially assist, sponsor, or provide financial, material, or technological support for, or goods or services to, individuals or entities engaging in such activities.   *See id.* § 1(a)(i)-(v).   Executive

3

Order 13660 prohibits, among other things, transferring, paying, exporting, withdrawing, or otherwise dealing in any interest in property in the United States owned by a person whose property and interests in property are blocked (a "blocked person"), as well as the making of any contribution or provision of funds, goods, or services by a United States person to, or for the benefit of a blocked person, and the receipt of any contribution or provision of funds, goods, or services by a United States person from any such blocked person. *Id.* §§ 1, 4. For the purposes of Executive Order 13660, the term "United States person" includes, among others, United States citizens. *See id.* § 6(c).

8.     The President on multiple occasions has expanded the scope of the national emergency declared in Executive Order 13660, including through: (1) Executive Order 13661, which addresses the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine, *see* Exec. Order No. 13661 (Mar. 16, 2014), 79 Fed. Reg. 15,535 (Mar. 19, 2014); and (2) Executive Order 13662, which addresses the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine, *see* Exec. Order No. 13662 (Mar. 20, 2014), 79 Fed. Reg. 16,169 (Mar. 24, 2014). Executive Orders 13660, 13661, and 13662 are collectively referred to as the "Ukraine-Related Executive Orders." *See* 31 C.F.R. 589.310. On February 21, 2022, the President again expanded the scope of the national emergency, finding that the Russian Federation's purported recognition of the so-called Donetsk People's Republic and Luhansk People's Republic regions of Ukraine contradicts Russia's commitments under the Minsk agreements and threatens the peace, stability, sovereignty, and territorial integrity of Ukraine.

9.      The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine has remained in continuous effect since 2014, and was most recently continued on March 2, 2022.   *See* Continuation of the National Emergency With Respect to Ukraine, 87 Fed. Reg. 12387 (Mar. 4, 2022).

10.      To implement Executive Order 13,660, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued certain Ukraine-Related Sanctions Regulations.   These regulations incorporate by reference the prohibited transactions set forth in the Ukraine-Related Executive Orders.   *See* 31 C.F.R. § 589.201.   The regulations also provide that the names of persons designated by OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests are therefore blocked, are published in the Federal Register and incorporated into the Specially Designated Nationals ("SDN") and Blocked Persons List (the "SDN List"), which is published on OFAC's website.   *See id.* note 1.

11.      According to the Ukraine-Related Sanctions Regulations, a person whose property and interest in property is blocked pursuant to the Ukraine-Related Executive Orders is treated as having an interest in all property and interests in property of any entity in which the person owns, directly or indirectly, a 50 percent or greater interest.   *See* 31 C.F.R. § 589.406. Accordingly, such an entity is deemed a person whose property and interests in property are blocked, regardless of whether the name of the entity is incorporated into OFAC's SDN List. *See id.*

## Probable Cause Regarding the Subject Offenses

12.      This action arises out of an FBI investigation into OFAC-sanctioned Russian national Konstantin Malofeyev's links to the United States and the U.S. financial system and sanctions-violative activity by Malofeyev and others in support of his interests.

5

13.     On or about December 19, 2014, OFAC designated Malofeyev as an SDN pursuant to Executive Order 13,660.   *See* 80 Fed. Reg. 6797 (Feb. 6, 2015).   *See also* U.S. Dep't of Treasury, Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List, available at https://www.treasury.gov/ofac/downloads/sdnlist.pdf (accessed March 31, 2022).

14.     According to OFAC, Malofeyev funded separatist activities in eastern Ukraine and was closely linked with Aleksandr Borodai, Igor Girkin (a.k.a. Igor Strelkov), and the so-called Donetsk People's Republic, all which have been previously sanctioned as SDNs. *See* U.S. DEP'T. TREASURY, Treasury Targets Additional Ukrainian Separatists and Russian Individuals and Entities (Dec. 19, 2014), available at https://www.treasury.gov/press-center/press-releases/Pages/jl9729.aspx (accessed March 31, 2022).

15.     Further according to OFAC, Malofeyev was one of the main sources of financing for Russians promoting separatism in Crimea, and was designated as an SDN because he was responsible for or complicit in, or has engaged in, actions or polices that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine and has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of the so-called Donetsk People's Republic.   *See id*.

<u>The Scheme to Evade United States Sanctions on Malofeev</u>

16.     The FBI's investigation into Malofeyev has included, among other topics, services provided by U.S. citizen John ("Jack") Hanick to and for the benefit of Malofeyev and certain Malofeyev-owned entities.   On November 4, 2021, a grand jury sitting in the Southern District of New York returned an indictment charging Hanick with sanctions violations in violation of 50 U.S.C. § 1705 and the Ukraine-Related Sanctions Regulations (the "Hanick

6

Indictment"). A copy of the Hanick Indictment is attached hereto as Exhibit A and incorporated by reference. As the grand jury found, there is probable cause to believe that Hanick worked for Malofeyev and was paid by Malofeyev, in violation of the Ukraine-Related Sanctions Regulations. *See* Hanick Indictment ¶¶ 10-27.

17.     On April 4, 2022, a grand jury sitting in the Southern District of New York returned an indictment charging Malofeyev with conspiracy to violate and violation of 50 U.S.C. § 1705 and the Ukraine-Related Sanctions Regulations (the "Malofeyev Indictment"). A copy of the Malofeyev Indictment is attached hereto as Exhibit B and incorporated by reference. As the grand jury found, there is probable cause to believe that Malofeyev employed Hanick and paid Hanick, and that Malofeyev engaged in and attempted to engage in transactions involving Malofeyev's blocked property in the United States, in violation of the Ukraine-Related Sanctions Regulations. *See* Malofeyev Indictment ¶¶ 10-33.

The Scheme to Transfer the Texas Bank Investment

18.     The Investigation learned through sources of information including a review of data obtained pursuant to search warrants on multiple email accounts used by members of the conspiracy (the "Email Search Warrants"), as well as email header data obtained for additional email accounts, records obtained pursuant to grand jury subpoenas, and data appearing on a B1/B2 visa application, the following regarding certain associates of Malofeyev:

a.     Between in or about 2014 and in or about 2016, Malofeyev and a Greek business associate (the "Greek Business Partner") agreed to jointly acquire and operate a Greek television network, and to employ Hanick to run the Greek television network. Malofeyev and the Greek Business Partner both provided operating funding for the Greek television network, and Malofeyev paid Hanick's regular salary while Hanick ran the network, while the

7

Greek Business Partner also agreed to make certain payments to Hanick for his services to the partnership between Malofeyev and the Greek Business Partner.

        b.    Malofeyev employs a Russian attorney (the "Russian Attorney") who has served as the General Counsel to Malofeyev's private equity fund, Marshall Capital Partners Limited, and has more broadly represented Malofeyev and his companies, and has been in contact with a number of Malofeyev-related entities and associates since at least in or about April 2011 and continuing through the present.

        c.    Malofeyev employs a Russian accountant (the "Malofeyev Accountant") who has worked for Malofeyev's private equity fund, Marshall Capital Partners Limited. The Russian accountant served on the board of the Russian television network owned by Malofeyev at which Hanick was employed, and worked closely with Hanick on the budgeting and financing of the Russian television network and the Greek television network.

        d.    The Greek Business Partner employs a Greek attorney (the "Greek Attorney") to represent him for various purposes, including in his dealings with Malofeyev.

        19.    As described immediately below, the Investigation discovered that Malofeyev's employment of Hanick included having Hanick participate in a transaction in property owned by Malofeyev in the United States, specifically an investment in Strategic Growth Bancorp, a Texas bank, in violation of the Ukraine-Related Sanctions Regulations.

        20.    Based on records and information obtained from the successor company of Strategic Growth Bancorp ("SGB" or the "Texas Bank"), as well as records obtained from Goldman Sachs, the Investigation has learned the following:

        a.    SGB was at relevant times a Texas-based financial institution.

    b.  In or about March 2014, Malofeyev made an investment of approximately $10 million in the Texas Bank.   Malofeyev purchased shares in the Texas Bank through a Seychelles shell company called Investment Market Group Limited ("IMGL" or the "Shell Company").   A United States investment bank (the "Investment Bank") acted as the Texas Bank's placement agent in the deal, and in that capacity worked to secure Malofeyev's investment as well as investments by third parties.

    c.  Malofeyev was suggested to the Investment Bank as a potential investor in the Texas Bank by another Investment Bank client, a Texas attorney (the "Texas Attorney").   The Texas Attorney described having a Russian colleague who was looking to make an investment, and described meeting with Malofeyev at the airport in Houston, Texas about the potential investment and other projects.

    d.  Before and shortly after Malofeyev bought his shares in the Texas Bank, representatives of Malofeyev and his private equity fund, Marshall Capital Partners Limited, communicated with the Investment Company and/or the Texas Bank regarding the ownership and funding of the Shell Company and Marshall Capital Partners.   For example: (1) in February 2014, the Russian Attorney introduced himself as "General Counsel to Mr. Konstantin Malofeev and his Marshall Capital group of companies": (2) the Russian Attorney stated in March 2014 that IMGL is "wholly owned, indirectly, via a number of entities, by our principal, Mr. Konstantin Malofeyev"; (3) in March 2014, the Russian Attorney noted that before Malofeyev could purchase his shares in the Texas Bank, they would need to "finance the SPV," which the Investigation has learned is a reference to the Shell Company, which was a "special purpose vehicle" or "SPV" to hold Malofeyev's shares in the Texas Bank, and ultimately provided confirmation that funds had been sent to the Shell Company; (4) also in March 2014,

the Russian Attorney provided details of the SPV that Malofeyev would be using in the Texas Bank investment, and sent a profile of Marshall Capital Partners Limited; and (5) in April 2014, the Russian Attorney directed another Malofeyev employee to provide corporation documents for IMGL, Pimura Consultancy Ltd., and Frontier Management Corp., which the employee sent as requested using a Marshall Capital email address and signature block.

      e.     As noted previously, Malofeyev was OFAC-sanctioned on December 19, 2014.   As a result of Malofeyev's addition to the SDN List, Malofeyev's interest in the Texas Bank became blocked property under the Ukraine-Related Sanctions Regulations, and the Texas Bank filed a blocked asset report with OFAC regarding Malofeyev's ownership of the certificate of shares in the name of the Shell Company.

      21.     Based on a review of emails obtained from the Email Search Warrants, bank records obtained pursuant to a grand jury subpoena, and documents obtained from the Texas Bank pursuant to a grand jury subpoena, the Investigation learned the following, among other things:

      a.     On or about March 17, 2015, a known Malofeyev associate (the "Malofeyev Associate")—using an email address associated with the St. Basil the Great Foundation, Malofeyev's charity—emailed the Texas Attorney a Power of Attorney naming the Texas Attorney as the attorney and representative of the Shell Company.   The Malofeyev Associate asked the Texas Attorney to "check the current status, how much the share is worth now, and all other details."   The Malofeyev Associate stated "We want to keep it where it is now, only the owner from our side changes."   The Texas Bank records indicate that the Malofeyev Associate is referencing Malofeyev's investment in the Texas Bank and a proposed change of ownership of the Shell Company as of March 2015.   Because Malofeyev was subject

to U.S. sanctions at this point in time, any change of ownership of Malofeyev's stake in a U.S. company would be a violation of the Ukraine-Related Sanctions Regulations, unless conducted pursuant to a license issued by OFAC.   The Texas Attorney forwarded the Malofeyev Associate's email and the Power of Attorney to the Texas Bank, and requested a call with the bank's Chairman.

          b.       In or about May 2015, the Russian Attorney exchanged several emails with the Greek Attorney regarding a plan to draft and sign a Sale and Purchase Agreement to transfer ownership of the Shell Company from Malofeyev to the Greek Business Partner, which would have the effect of transferring ownership of the Texas Bank Investment, in violation of the Ukraine-Related Sanctions Regulations.

          c.       On or about June 8, 2015, the Greek Business Partner sent an email to the Russian Attorney, the Greek Attorney, Hanick, and the Russian Accountant, in which the Greek Business Partner explained that he planned to use the Texas Bank Investment as "collateral . . . to obtain a bank guarantee covering the payments due." On the same date, Hanick replied to the Greek Business Partner and the other recipients stating "I will wait in Moscow one more day for documents. I will return to Greece on Wednesday." The Greek Business Partner responded to Hanick instructing him to "be in touch with" the Russian Attorney and the Greek Attorney and "make sure all necessary documents will be handed over to you." Based on information uncovered in the Investigation, this is a reference to documentation of Malofeyev's ownership of the Texas Bank Investment, and the Greek Business Partner was instructing Hanick to obtain this documentation in Moscow and deliver it to the Greek Business Partner in Greece.

          d.       On June 10, 2015, Hanick flew from Moscow to Athens. On June 15, 2015, the Greek Attorney sent an email to the Russian Attorney and the Russian Accountant,

11

confirming that the Greek Business Partner had received a "copy of the share certificate" in the Texas Bank, which is the documentation that Hanick had brought to the Greek Business Partner from Moscow.

e.      On or about June 9, 2015, Malofeyev signed a Sale and Purchase Agreement purporting to transfer ownership of the Shell Company to the Greek Business Partner in exchange for "USD 1.00 (One US dollar)." The Sale and Purchase Agreement was printed with a blank space for the date of the agreement, and a handwritten date was added that falsely indicated that the agreement was made in July 2014, rather than in June 2015. The Investigation has learned that OFAC did not grant a license for the transfer of Malofeyev's interest in the Texas Bank from Malofeyev to any other person.

f.      On or about July 8, 2015, a representative of the Texas Bank sent an email to the Russian Attorney, stating that the Texas Bank Investment "constitutes 'blocked property'" because Konstantin Malofeyev had been listed as a SDN, and that "as a result of this designation, Mr. Malofeev's property, and interests in property, within the United States must be frozen, and U.S. persons are generally prohibited from conducting any transactions with Mr. Malofeev." On or about July 10, 2015, the Russian Attorney responded, asserting falsely that: "As far as I know, the ownership over [the Shell Company] was transferred by Mr. Malofeev to a third party (a new ultimate beneficial owner) at the beginning of July 2014, i.e. before the SDN designation." In truth, as Malofeyev and the Russian Attorney well knew, the transfer of the Shell Company was executed in June 2015, at approximately the same time as Hanick physically delivered documentation of Malofeyev's ownership to the Greek Business Partner and after the designation of Malofeyev as an SDN.

g.      After delivering the documentation of ownership to the Greek

Business Partner, Hanick traveled to the United States and stayed in the Southern District of New

York. While he was in the Southern District of New York, Hanick corresponded with the Greek

Business Partner regarding a payment the Greek Business Partner intended to make to Hanick,

which the Investigation has learned to be a payment for Hanick's work for the Greek Business

Partner and Malofeyev, including his work on the Greek television network and his work in

assisting with the transfer of the Texas Bank Investment from Malofeyev to the Greek Business

Partner. Hanick sent the Greek Business Partner information for his bank account held in the

Southern District of New York, and the Greek Business Partner wired a payment of $72,000 to

that bank account in or around July 2015.

h.      Notwithstanding the Texas Bank's notification to the Russian

Attorney that the Texas Bank share certificate was blocked property that could not lawfully be

transferred, on or about February 27, 2016, the Greek Attorney sent an email to the Russian

Attorney and the Russian Accountant stating, in substance, that the Greek Business Associate

had been able to benefit from the transfer of ownership of the Texas Bank Investment by

pledging the share certificate as collateral for a credit facility from a bank in Greece, but that the

bank had subsequently learned that the certificate was blocked property and was now demanding

repayment directly from the Greek Business Partner.

<u>The Defendant-*in-rem*</u>

22.     The Investigation obtained bank records and other information from Sunflower

Bank, the successor bank to Strategic Growth Bancorp, which revealed that:

a.      In or about June 2016, Sunflower Bank entered into a merger

agreement with Strategic Growth Bancorp. The merger agreement permitted shareholders in

13

Strategic Growth Bancorp to convert their shares to shares in Sunflower Bank. In the alternative, Sunflower Bank would exchange the shareholders' certificates for cash.

        b.   Konstantin Malofeyev, who was still understood by Strategic Growth Bancorp to be the beneficial owner of shares in Strategic Growth Bancorp, did not submit a request to convert his shares into shares in Sunflower Bank. Accordingly, Sunflower Bank converted his shares into cash and placed it in a bank account numbered 1101996560, held in the name of "OFAC Blocked Account Malofeyev." (the "Subject Account"). The Subject Account consisted exclusively of the funds that were exchanged for Malofeyev's shares in Strategic Growth Bancorp, and interest that has accrued on those funds since the conversion.

        23.    As a result of this investigation, the government obtained a seizure warrant on or about April 5, 2022 (the "Seizure Warrant") for the contents of the Subject Account which represented the proceeds of the Subject Offenses. On or about April 5, 2022, the Seizure Warrant was executed and the Government seized the Defendant-*in-rem*. A copy of the Seizure Warrant is attached hereto as Exhibit C, and is incorporated by reference as if set forth fully herein.   The Defendant-*in-rem* is now located in the Southern District of New York.

### III.   CLAIMS FOR FORFEITURE

### Claim One

### Forfeiture Under 18 U.S.C. § 981(a)(1)(C)
### (Proceeds Traceable to Violations of IEEPA)

24.     Paragraphs 1 through 23 of this Complaint are repeated and re-alleged as if fully set forth herein.

### *Violations of IEEPA*

25.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

26.     As defined in 18 U.S.C. § 1956(c)(7), "specified unlawful activity," includes, among other things, a violation of "section 206 (relating to penalties) of the International Emergency Economic Powers Act," which is codified at Title 50, United States Code, Section 1705.

27.     By reason of the foregoing the Defendant-*in-rem* is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) as property constituting or derived from proceeds traceable to a violation of Title 50, United States Code, Section 1705, or as property traceable to such property

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant-*in-rem* and that all persons having an interest in the Defendant-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant-*in-rem* to the United States of America for

disposition according to law, and that this Court grant Plaintiff such further relief as this Court

may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
      November 30, 2022

                                     DAMIAN WILLIAMS
                                     United States Attorney for the
                                     Southern District of New York
                                     Attorney for the Plaintiff
                                     United States of America

By:          _____

                                     THANE REHN
                                     Assistant United States Attorney
                                     One St. Andrew's Plaza
                                     New York, New York 10007
                                     Telephone: (212) 637-2354

16

## **VERIFICATION**

STATE OF NEW YORK          )
COUNTY OF NEW YORK       :
SOUTHERN DISTRICT OF NEW YORK  )

        Kenneth Wolf, being duly sworn, deposes and says that he is a Special Agent with

the Federal Bureau of Investigation (the "FBI"), and as such has responsibility for the within

action; that he has read the foregoing complaint and knows the contents thereof, and that the

same is true to the best of his knowledge, information, and belief.

        The sources of deponent's information and the ground of his belief are official

records and files of the FBI, information obtained directly by the deponent, and information

obtained by other law enforcement officials, during an investigation of alleged violations of Title

18 and Title 50 of the United States Code.

KENNETH WOLF
Special Agent
Federal Bureau of Investigation

17

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - x
                          :

UNITED STATES OF AMERICA        :   SEALED INDICTMENT
                          :

      -v.-               :   21 Cr.

JOHN HANICK,              :
    a/k/a "Jack Hanick,"      21 CRIM 676
                          :

          Defendant.     :
- - - - - - - - - - - - - - - - - - - - x

**COUNT ONE**
**(Violation of the International Emergency Economic Powers Act)**

      The Grand Jury charges:

**The Defendant**

      1.   JOHN HANICK, a/k/a "Jack Hanick," the defendant, is a United States citizen. From in or around 1996 through in or around 2011, HANICK worked as a producer for a United States cable television network located in New York, New York. Thereafter, from in or about 2013 through in or about 2017, HANICK worked in support of the efforts of a Russian national who was subjected to economic sanctions as of December 2014, to establish and develop media outlets in Russia, Greece, Bulgaria, and elsewhere.

**The International Emergency Economic Powers Act and the Relevant Sanctions Orders and Regulations**

      2.   The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign

policy of the United States. Section 1705 provides, in part, that
"[i]t shall be unlawful for a person to violate, attempt to
violate, conspire to violate, or cause a violation of any license,
order, regulation, or prohibition issued under this chapter." 50
U.S.C. § 1705(a).

3.   In 2014, pursuant to his authorities under the
IEEPA, the President issued Executive Order 13,660, which declared
a national emergency with respect to the situation in Ukraine. To
address this national emergency, the President blocked all
property and interest in property that were then or thereafter
came within the United States or the possession or control of any
United States person, of individuals determined by the Secretary
of the Treasury to meet one or more enumerated criteria. These
criteria include, but are not limited to, individuals determined
to be responsible for or complicit in, or who engage in, actions
or policies that threaten the peace, security, stability,
sovereignty, or territorial integrity of Ukraine; or who
materially assist, sponsor, or provide financial, material, or
technological support for, or goods or services to, individuals or
entities engaging in such activities. Executive Order 13,660
prohibits, among other things, the making of any contribution or
provision of funds, goods, or services by, to, or for the benefit
of any person whose property and interests in property are blocked,
and the receipt of any contribution or provision of funds, goods,

2

or services from any such person.

4.   The national emergency declared in Executive Order 13,660 with respect to the situation in Ukraine has remained in continuous effect since 2014, and was most recently continued on March 2, 2021.

5.   The President twice expanded the scope of the national emergency declared in Executive Order 13,660, through: (1) Executive Order 13,661, issued on March 16, 2014, which addresses the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13,662, issued on March 20, 2014, which addresses the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine. Executive Orders 13,660, 13,661, and 13,662 are collectively referred to as the "Ukraine-Related Executive Orders."

6.   The Ukraine-Related Executive Orders authorized the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under the IEEPA, as may be necessary to carry out the purposes of those orders. The Ukraine-Related Executive Orders further authorized the Secretary of the Treasury to redelegate any of these functions to other offices and agencies of the United States Government.

3

7.    To implement the Ukraine-Related Executive Orders, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued certain Ukraine-Related Sanctions Regulations. These regulations incorporate by reference the definition of prohibited transactions set forth in the Ukraine-Related Executive Orders. *See* 31 C.F.R. § 589.201. The regulations also provide that the names of persons designated directly by the Ukraine-Related Executive Orders, or by OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests are therefore blocked, are published in the Federal Register and incorporated into the Specially Designated Nationals ("SDN") and Blocked Persons List (the "SDN List"), which is published on OFAC's website. *Id.* Note 1.

8.    According to the Ukraine-Related Sanctions Regulations, a person whose property and interest in property is blocked pursuant to the Ukraine-Related Executive Orders is treated as having an interest in all property and interests in property of any entity in which the person owns, directly or indirectly, a 50 percent or greater interest. *See* 31 C.F.R. § 589.406. Accordingly, such an entity is deemed a person whose property and interests in property are blocked, regardless of whether the name of the entity is incorporated into OFAC's SDN List. *Id.*

9.    On or about December 19, 2014, OFAC designated

4

Konstantin Malofeyev ("Malofeyev") as an SDN pursuant to Executive Order 13,660. In so designating Malofeyev, OFAC explained that Malofeyev was one of the main sources of financing for Russians promoting separatism in Crimea, and was designated as an SDN because he was responsible for or complicit in, or has engaged in, actions or polices that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine and has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of the so-called Donetsk People's Republic.

### The Sanctions Violations

10.   From at least in or about 2013, through at least in or about 2017, JOHN HANICK, a/k/a "Jack Hanick," the defendant, provided funds, goods, and services to and for the benefit of Malofeyev and companies owned and controlled by Malofeyev, and received funds, goods, and services from Malofeyev. HANICK continued to engage in this conduct after OFAC listed Malofeyev as a SDN, in violation of the Ukraine-Related Sanctions Regulations.

### HANICK's Work for Malofeyev on the Russian TV Network

11.   In or about February 2013, JOHN HANICK, a/k/a "Jack Hanick," the defendant, traveled from New York, New York, to Moscow, Russia. As HANICK himself recounted in an unpublished "memoir" discovered by investigators through the judicially authorized search of HANICK's email account, HANICK ostensibly

5

traveled to Russia at this time to speak at a conference, but was informed by an associate of Malofeyev that "the real purpose of the trip" was to "introduce [HANICK] to investors" in a planned television news network in Russia. Between February 2013 and June 2013, HANICK made four further trips to Russia. During these trips, he met with Malofeyev and associates of Malofeyev to discuss Malofeyev's plan to create a new Russian cable television news network (the "Russian TV Network").

12. At all times relevant to this Indictment, Malofeyev is and has been the Chairman of the Board of Directors of a corporate group, which has a public website that lists the Russian TV Network as one of its projects. The Russian TV Network also has its own website, which, as of the date of this Indictment, lists Malofeyev as the Founder of the Russian TV Network.

13. Beginning in at least the first half of 2013, JOHN HANICK, a/k/a "Jack Hanick," the defendant, began corresponding with Malofeyev and associates of Malofeyev regarding HANICK's plan to work for Malofeyev on the Russian TV Network. On or about April 27, 2013, HANICK sent Malofeyev an email in which HANICK stated that he "came to Russia to work for you." Shortly thereafter, HANICK and others exchanged email messages containing draft organizational charts for the Russian TV Network that listed Malofeyev at the top of the organizational chart with the title of "Analytical News Director," and listed HANICK as the Managing

Director reporting directly to Malofeyev.

14.  In or about July 2013, JOHN HANICK, a/k/a "Jack Hanick," the defendant, moved to Russia. Prior to moving there, HANICK negotiated the terms of his employment directly with Malofeyev, including the salary he would receive, the payment for his housing in Moscow, and his Russian work visa. In or about May 2013, HANICK sent an email to Malofeyev to confirm their agreement on HANICK's salary, a $5,000 monthly housing stipend, and health insurance, so that Malofeyev's attorney could prepare HANICK's "work contract for my visa." An attorney at a Malofeyev-owned investment company subsequently emailed HANICK a draft employment contract between a separate Russian entity and HANICK, that reflected the terms that HANICK had agreed with Malofeyev.

15.  Upon his move to Russia in or around July 2013, JOHN HANICK, a/k/a "Jack Hanick," the defendant, primarily worked for Malofeyev on the project of starting up the Russian TV Network. In his work, HANICK routinely referred to Malofeyev as the "investor" or the "shareholder" in the Russian TV Network, and discussed instructions for the network that HANICK had received from Malofeyev. In or around May 2014, HANICK sent an email in which he stated that "[t]he issue for our investor is how important it is to be on the air in September. There is a worldwide conference in September which he is sponsoring bringing people from all over the world to Moscow." This was a reference to a conference

sponsored in September 2014 by a foundation created and funded by Malofeyev. In or about January 2015, HANICK wrote to Malofeyev that the Russian TV Network would "implement your vision" and that HANICK wanted to "emphasize to all that you are not an investor in someone [else's] ideas." HANICK also communicated Malofeyev's instructions to other employees at the Russian TV Network. In or about July 2014, HANICK wrote to others that "[o]ur investor expects to see many stories on our youtube channel by August 1."

16. On or about December 19, 2014, OFAC designated Malofeyev as an SDN. Nonetheless, JOHN HANICK, a/k/a "Jack Hanick," the defendant, continued to work for Malofeyev on the Russian TV Network and reported directly to Malofeyev. In or about January 2015, HANICK sent Malofeyev a draft of a "[Russian TV Network] Board News Policy." HANICK wrote that the policy was meant "to implement your vision and to provide you with information for you to make decisions . . . You are the founder and chief architect of the project. We, as board members have the responsibility to direct the staff to implement your instructions." Later in or about January 2015, HANICK sent an email to Malofeyev regarding the "Funding of [the Russian TV Network]," in which HANICK noted that "there is 0 money on our account" and "You said when we had a problem to contact you directly."

17. The Russian TV Network went on the air in Russia in or about April 2015. JOHN HANICK, a/k/a "Jack Hanick," the

defendant, played a leadership role at the network. In emails spanning from 2015 through 2017, HANICK was at different times described as "Board Chairman, [Russian TV Network]," "General Producer" of the Russian TV Network, "chairman of the HR committee" for the Russian TV Network, and "General Advisor" to the Russian TV Network. HANICK also sent Malofeyev regular emails containing HANICK's analysis of the network's television ratings.

18. JOHN HANICK, a/k/a "Jack Hanick," the defendant, was generally responsible for the technical and operational aspects of the Russian TV Network, pursuant to a plan developed with Malofeyev. For example, in or about August 2016, HANICK wrote an email to another Russian TV Network employee in which HANICK wrote: "When we were with Konstantin, we agreed that we would discuss editorial function of new studio and only then create the technical task. . . . [another Russian TV Network employee] does editorial content without our interference, you do administrative and financial without interference, and I do production and operations."

19. JOHN HANICK, a/k/a "Jack Hanick," the defendant, was paid for his work for the Russian TV Network through two Russian entities. From in or about 2013 through in or about February 2016, HANICK was paid by a Russian entity ("Russian Entity-1"). From in or about May 2016 through 2018, HANICK was paid by another Russian entity ("Russian Entity-2"). This

9

compensation was overseen by Malofeyev, however. In 2013, HANICK negotiated his salary directly with Malofeyev, and an attorney employed by Malofeyev sent Hanick the draft employment contract with Russian Entity-1. Later, when his pay was coming from Russian Entity-2, HANICK continued to report to Malofeyev. In or about May 2018, HANICK sent an email to Malofeyev, writing "At the end of May, I'll be finished with [Russian Entity-2]. This means that my visa to stay in Russia will end. We need help to stay. Can [Russian Entity-2] extended my employment without pay? My visa with them is through next April? Can you help? I'm sure the solution is simple." HANICK was paid in Russia for his work for Malofeyev and held the payments in a Russian bank account. However, HANICK returned some of these funds to the United States. In or about March 2017, HANICK wired a portion of the payments he had received from Russian Entity-2 from his Russian bank account to a bank account he held at a bank located in New York, New York.

### HANICK's Work For Malofeyev on the Greek TV Network

20.  While working for Malofeyev on the Russian TV Network, JOHN HANICK, a/k/a "Jack Hanick," the defendant, also worked for Malofeyev on a project to establish and run a Greek television network (the "Greek TV Network") as a joint venture between Malofeyev and a Greek associate of Malofeyev (the "Greek Business Partner"). According to HANICK's unpublished memoir,

Malofeyev introduced HANICK to the Greek Business Partner at a social event hosted by Malofeyev in Moscow.

21. In or about November or December 2014, JOHN HANICK, a/k/a "Jack Hanick," the defendant, began traveling from Moscow to Greece to meet with the Greek Business Partner and explore the idea of building a Greek television network that would partner with the Russian TV Network. Malofeyev's personal assistants arranged and booked HANICK's travel to and from Greece, and HANICK reported on his trips directly to Malofeyev. In or about December 2014, HANICK sent an email to Malofeyev and the Greek Business Partner to report on a visit that HANICK and the Greek Business Partner had made to a local television station in Greece, which HANICK referred to as "the station which we will own."

22. In or about May 2015, JOHN HANICK, a/k/a "Jack Hanick," the defendant, relocated from Moscow to Greece to work primarily on the Greek TV Network, while continuing to work for the Russian TV Network as well. Shortly before the move, the Greek Business Partner wrote an email to HANICK stating that "Both K. and I want you in Greece."

23. JOHN HANICK, a/k/a "Jack Hanick," the defendant, primarily resided in Greece from in or about May 2015 through in or about February 2016. During that time, HANICK reported regularly to Malofeyev on his work on the Russian TV Network and the Greek TV Network, and routinely emphasized the corporate synergy between

11

the two networks. In or about November 2015, HANICK wrote to Malofeyev that the Greek TV Network was an "opportunity to detail Russia's point of view on Greek TV," and emphasized "our vision of cooperation." Also in or about November 2015, HANICK wrote to Malofeyev that "In order to facilitate the synergy between media holdings, [the Russian TV Network] and [the Greek TV Network] shall provide all resources possible to help each other achieve their goals." In or about December 2015, in response to an inquiry about the Greek TV Network from a representative of Malofeyev, HANICK wrote that "The news about Russia is reported from a Russian reporter from the Russian point of view."

### HANICK's Work for Malofeyev on the Bulgarian TV Network

24. Beginning in or about January 2015, JOHN HANICK, a/k/a "Jack Hanick," the defendant, began assisting Malofeyev in Malofeyev's efforts to acquire a Bulgarian television network (the "Bulgarian TV Network"). Publicly, the Greek Business Partner claimed to be the person who was attempting to acquire the Bulgarian TV Network, but HANICK was privately working on Malofeyev's behalf to acquire the network.

25. In or about January 2015, JOHN HANICK, a/k/a "Jack Hanick," the defendant, wrote in an email that Malofeyev had "asked me to go to Bulgaria to see the station, evaluate the equipment, and personnel." The following day, HANICK sent an email to an employee of Malofeyev's investment company to ask if they had

contacted the prospective business partner in Bulgaria (the "Bulgarian Business Partner"). HANICK explained that "I must see the station before [the Bulgarian Business Partner's] visit to Moscow on Tuesday. . . . Konstantin needs this information from me."

26. After visiting the Bulgarian TV Network station in Bulgaria on or about February 5, 2015, JOHN HANICK, a/k/a "Jack Hanick," the defendant, wrote a report of his visit to Malofeyev, including HANICK's recommendation that the Russian TV Network begin producing Russian language programming to be broadcast on the Bulgarian TV Network. On or about February 16, 2015, HANICK wrote to the Greek Business Partner, explaining that HANICK was with Malofeyev, who wanted HANICK to travel to Bulgaria the next day "to deal with bank to buy Bulgaria tv and restructure loan." HANICK went on to explain that the Greek Business Partner should send someone to travel with HANICK to help to conceal Malofeyev's role in the acquisition: "He asked me to ask you if someone from your company could come with me to talk to the bank since we understand you cannot go. The buyer should not be Russian but Greek. . . . Please call me or Konstantin directly."

27. In or about April 2015, JOHN HANICK, a/k/a "Jack Hanick," the defendant, wrote an email to update Malofeyev on the Bulgarian TV Network negotiations, outlining the structure of the proposed deal. Malofeyev responded "No. It is wrong. I told you

the correct way to follow in my office." Hanick replied "Thank you, We will proceed as your plan!" About two weeks after this exchange, the Bulgarian police raided the Bulgarian TV Network station to seize equipment on behalf of its creditor bank. The day after the raid, HANICK sent Malofeyev a translation of a Polish-language news article that apparently reported that Malofeyev was rumored to be the true financier of the Bulgarian TV Network deal, despite the Greek Business Partner purportedly being the buyer.

HANICK's False Statements to United States Law Enforcement

28.  On or about February 2, 2021, JOHN HANICK, a/k/a "Jack Hanick," the defendant, was interviewed by Special Agents from the Federal Bureau of Investigation. During this interview, the interviewing agents informed HANICK that they were conducting the interview in connection with a criminal investigation and that they worked in the FBI Field Office in New York, New York. During the interview, HANICK acknowledged that he had learned that Malofeyev was subject to United States sanctions within several months of when they were announced in December 2014, and that he knew that United States persons were not permitted to do business with persons who were sanctioned. HANICK also falsely stated, in substance and in part, that Malofeyev had no involvement in HANICK's travel to Bulgaria in connection with the Bulgarian TV Network deal, and that HANICK did not know that Malofeyev had any connection to the Bulgarian TV Network until reading about it

afterward in the press.

## Statutory Allegations

29.    From at least in or about 2015 through in or about 2018, in the Southern District of New York and elsewhere, JOHN HANICK, a/k/a "Jack Hanick," the defendant, who was a United States person, unlawfully, willfully, and knowingly violated the IEEPA, and the regulations promulgated thereunder, as described above, to wit, HANICK willfully and knowingly provided and caused others to provide funds, goods, and services to and for the benefit of Konstantin Malofeyev, whom OFAC had listed as a Specially Designated National, and companies owned and controlled by Malofeyev, and received funds, goods, and services from Malofeyev, without first obtaining the required approval of OFAC, and evaded and avoided the requirements of United States law with respect to the provision of funds, goods, and services to and for the benefit of Malofeyev, in violation of Executive Orders 13,660, 13,661, and 13,662, and 31 C.F.R. § 589.201.

(Title 50, United States Code, Section 1705; Executive Orders 13,660, 13,661, and 13,662, and Title 31, Code of Federal Regulations § 589.201)

## COUNT TWO

### (False Statements)

The Grand Jury further charges:

30.    The allegations set forth above in Paragraphs 1 through 30 are realleged and incorporated by reference as if set

fully forth herein.

31. On or about February 2, 2021, in the Southern District of New York and elsewhere, JOHN HANICK, a/k/a "Jack Hanick," the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, to wit, when interviewed by Special Agents from the Federal Bureau of Investigation, HANICK falsely stated that Konstantin Malofeyev had no involvement in HANICK's travel to Bulgaria in connection with the Bulgarian TV Network deal, and that HANICK did not know that Malofeyev had any connection to the Bulgarian TV Network until reading about it afterward in the press coverage, when in truth, and in fact, and as HANICK well knew, Malofeyev was among the individuals involved in attempting to acquire the Bulgarian TV Network, and was among the individuals with whom HANICK conferred and from whom HANICK received instructions regarding that attempted purchase for the purpose of expanding Malofeyev's media network.

(Title 18, United States Code, Section 1001.)

### FORFEITURE ALLEGATION

32. As a result of committing the offense alleged in Count One of this Indictment, JOHN HANICK, a/k/a "Jack Hanick," the defendant, shall forfeit to the United States, pursuant to

Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of the offense alleged in Count One, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

### Substitute Asset Provision

33.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of JOHN HANICK, a/k/a "Jack Hanick," the defendant,

        a.   cannot be located upon the exercise of due diligence;

        b.   has been transferred or sold to, or deposited with, a third party;

        c.   has been placed beyond the jurisdiction of the court;

        d.   has been substantially diminished in value; or

        e.   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461 to seek

forfeiture of any other property of the defendants up to the value

of the forfeitable property described above.

(Title 18, United States Code, Sections 981;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)


FOREPERSON

DAMIAN WILLIAMS
United States Attorney

18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

JOHN HANICK,
a/k/a "Jack Hanick,"

Defendant.

## SEALED INDICTMENT

21 Cr. ___

(50 U.S.C. § 1705; Executive Orders 13,660, 13,661, and 13,662;
31 C.F.R. § 589.201; 18 U.S.C. § 1001)

DAMIAN WILLIAMS
United States Attorney.

*Corey Mitchell*
Foreperson.

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - x
:            *Superseding*
UNITED STATES OF AMERICA            :    SEALED INDICTMENT
:
-v.-            :    S1 21 Cr. 676 (LAK)
:
KONSTANTIN MALOFEYEV,            :
:
Defendant.            :
- - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy to Violate the International Emergency Economic Powers Act)

The Grand Jury charges:

### The Defendant

1.     KONSTANTIN MALOFEYEV, the defendant, is a Russian national who was at all relevant times the owner and managing partner of Marshall Capital Partners, which was a Russian equity investment group. On or about December 19, 2014, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated MALOFEYEV as a Specially Designated National ("SDN"). In so designating MALOFEYEV, OFAC explained that MALOFEYEV was one of the main sources of financing for Russians promoting separatism in Crimea, and was designated as an SDN because he was responsible for or complicit in, or has engaged in, actions or polices that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine and has materially assisted, sponsored, or provided financial, material,

or technological support for, or goods or services to or in support of the so-called Donetsk People's Republic.

## The International Emergency Economic Powers Act and the Relevant Sanctions Orders and Regulations

2.     The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

3.     In 2014, pursuant to his authorities under the IEEPA, the President issued Executive Order 13660, which declared a national emergency with respect to the situation in Ukraine. To address this national emergency, the President blocked all property and interest in property that were then or thereafter came within the United States or the possession or control of any United States person, of individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria. These criteria include, but are not limited to, individuals determined to be responsible for or complicit in, or who engage in, actions or policies that threaten the peace, security, stability,

sovereignty, or territorial integrity of Ukraine; or who materially assist, sponsor, or provide financial, material, or technological support for, or goods or services to, individuals or entities engaging in such activities. Executive Order 13660 prohibits, among other things, transferring, paying, exporting, withdrawing, or otherwise dealing in any interest in property in the United States owned by a person whose property and interests in property are blocked (a "blocked person"), as well as the making of any contribution or provision of funds, goods, or services by a United States person, to, or for the benefit of a blocked person, and the receipt of any contribution or provision of funds, goods, or services by a United States person from any such blocked person.

4.     The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine has remained in continuous effect since 2014, and was most recently continued on March 2, 2022.

5.     The President on multiple occasions has expanded the scope of the national emergency declared in Executive Order 13660, including through: (1) Executive Order 13661, issued on March 16, 2014, which addresses the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addresses the actions and policies of the

Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine. Executive Orders 13660, 13661, and 13662 are collectively referred to as the "Ukraine-Related Executive Orders." On February 21, 2022, the President again expanded the scope of the national emergency, finding that the Russian Federation's purported recognition of the so-called Donetsk People's Republic and Luhansk People's Republic regions of Ukraine contradicts Russia's commitments under the Minsk agreements and threatens the peace, stability, sovereignty, and territorial integrity of Ukraine.

6.    The Ukraine-Related Executive Orders authorized the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under the IEEPA, as may be necessary to carry out the purposes of those orders. The Ukraine-Related Executive Orders further authorized the Secretary of the Treasury to redelegate any of these functions to other offices and agencies of the United States Government.

7.    To implement the Ukraine-Related Executive Orders, OFAC issued certain Ukraine-Related Sanctions Regulations. These regulations incorporate by reference the prohibited transactions set forth in the Ukraine-Related Executive Orders. *See* 31 C.F.R. § 589.201. The regulations also provide that the names of persons designated directly by the Ukraine-Related Executive Orders, or by

OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests are therefore blocked, are published in the Federal Register and incorporated into the SDNs and Blocked Persons List (the "SDN List"), which is published on OFAC's website. *Id.* Note 1.

8. According to the Ukraine-Related Sanctions Regulations, a person whose property and interest in property is blocked pursuant to the Ukraine-Related Executive Orders is treated as having an interest in all property and interests in property of any entity in which the person owns, directly or indirectly, a 50 percent or greater interest. *See* 31 C.F.R. § 589.406. Accordingly, such an entity is deemed a person whose property and interests in property are blocked, regardless of whether the name of the entity is incorporated into OFAC's SDN List. *Id.*

9. On or about December 19, 2014, OFAC designated KONSTANTIN MALOFEYEV, the defendant, as an SDN pursuant to Executive Order 13660.

### The Sanctions Violations

10. From at least in or about 2013, through at least in or about 2018, KONSTANTIN MALOFEYEV, the defendant, employed John Hanick, a/k/a "Jack Hanick" ("Hanick"), a United States citizen, to provide funds, goods, and services to and for the benefit of MALOFEYEV and companies owned and controlled by MALOFEYEV, and to

5

receive funds, goods, and services from MALOFEYEV. MALOFEYEV continued to receive funds, goods, and services from Hanick, and to provide funds, goods, and services to Hanick, after being designated as an SDN in December 2014 and in violation of the Ukraine-Related Sanctions Regulations, until at least the end of 2018.

11. As part of the scheme to employ Hanick in violation of the Ukraine-Related Sanctions Regulations, KONSTANTIN MALOFEYEV, the defendant, used Hanick's assistance to transfer, and to attempt to transfer, interests in property in the United States owned by MALOFEYEV to a Greek associate of MALOFEYEV (the "Greek Business Partner"), in violation of the Ukraine-Related Sanctions Regulations.

MALOFEYEV Employs Hanick to Work on the Russian TV Network

12. At all times relevant to this Indictment, KONSTANTIN MALOFEYEV, the defendant, was and had been the Chairman of the Board of Directors of a corporate group, which had a public website listing the Russian TV Network as one of its projects. The Russian TV Network also had its own website, which, as of the date of this Indictment, listed MALOFEYEV as the Founder of the Russian TV Network.

13. Beginning in at least the first half of 2013, KONSTANTIN MALOFEYEV, the defendant, and associates of MALOFEYEV began corresponding with Hanick regarding MALOFEYEV's plan to

6

employ Hanick to work for MALOFEYEV on the Russian TV Network. On or about April 27, 2013, Hanick sent MALOFEYEV an email in which Hanick stated that he "came to Russia to work for you."

14.    In or about July 2013, Hanick moved to Russia. Prior to moving there, KONSTANTIN MALOFEYEV, the defendant, and Hanick negotiated the terms of Hanick's employment, including the salary Hanick would receive, the payment for his housing in Moscow, and his Russian work visa. In or about May 2013, MALOFEYEV sent an email to Hanick in which MALOFEYEV confirmed their agreement on Hanick's salary, a $5,000 monthly housing stipend, and health insurance, so that MALOFEYEV's attorney could prepare Hanick's "work contract for my visa." An attorney at MALOFEYEV's investment company, Marshall Capital Partners, subsequently emailed Hanick a draft employment contract between a separate Russian entity and Hanick, that reflected the terms that MALOFEYEV had agreed with Hanick.

15.    On or about December 19, 2014, OFAC designated KONSTANTIN MALOFEYEV, the defendant, as an SDN. Nonetheless, MALOFEYEV continued to employ Hanick on the Russian TV Network and Hanick continued to report directly to MALOFEYEV. In or about January 2015, Hanick sent MALOFEYEV a draft of a "[Russian TV Network] Board News Policy." Hanick wrote that the policy was meant "to implement your vision and to provide you with information for you to make decisions . . . You are the founder and chief architect

7

of the project. We, as board members have the responsibility to direct the staff to implement your instructions." Later in or about January 2015, Hanick sent an email to MALOFEYEV regarding the "Funding of [the Russian TV Network]," in which Hanick noted that "there is 0 money on our account" and "You said when we had a problem to contact you directly."

16. The Russian TV Network went on the air in Russia in or about April 2015. Hanick was generally responsible for the technical and operational aspects of the Russian TV Network, pursuant to a plan developed with MALOFEYEV. For example, in or about August 2016, Hanick wrote an email to another Russian TV Network employee in which Hanick stated: "When we were with Konstantin, we agreed that we would discuss editorial function of new studio and only then create the technical task. . . . [another Russian TV Network employee] does editorial content without our interference, you do administrative and financial without interference, and I do production and operations."

17. KONSTANTIN MALOFEYEV, the defendant, paid Hanick for his work for the Russian TV Network through two Russian entities. From in or about 2013 through in or about February 2016, MALOFEYEV arranged to pay Hanick through a Russian entity ("Russian Entity-1"), that had been listed as Hanick's employer on the employment contract MALOFEYEV had negotiated with Hanick. From in or about May 2016 through 2018, MALOFEYEV arranged to pay Hanick

8

through another Russian entity ("Russian Entity-2"). Although these entities nominally employed and paid Hanick, MALOFEYEV directly oversaw and was responsible for Hanick's employment and the payment of Hanick's salary. For instance, in or about May 2018, Hanick sent an email to MALOFEYEV, writing "At the end of May, I'll be finished with [Russian Entity-2]. This means that my visa to stay in Russia will end. We need help to stay. Can [Russian Entity-2] extended my employment without pay? My visa with them is through next April? Can you help? I'm sure the solution is simple." The salary payments MALOFEYEV made to Hanick were made to a Russian bank account in Hanick's name. However, Hanick returned some of these funds to the United States. In or about March 2017, Hanick wired a portion of the payments he had received from Russian Entity-2 from his Russian bank account to a bank account he held at a bank located in New York, New York.

<u>MALOFEYEV Employs Hanick on the Greek TV Network</u>

18. At the same time that he employed Hanick on the Russian TV Network, KONSTANTIN MALOFEYEV, the defendant, also directed Hanick to work on a project to establish and run a Greek television network (the "Greek TV Network") as a joint venture between MALOFEYEV and the Greek Business Partner. MALOFEYEV introduced Hanick to the Greek Business Partner in 2013.

19. In or about November or December 2014, Hanick began traveling from Moscow to Greece to meet with the Greek Business

Partner and explore the idea of building a Greek television network that would partner with the Russian TV Network. KONSTANTIN MALOFEYEV, the defendant, had his personal assistants arrange and book Hanick's travel to and from Greece, and Hanick reported on his trips directly to MALOFEYEV. In or about December 2014, Hanick sent an email to MALOFEYEV and the Greek Business Partner to report on a visit that Hanick and the Greek Business Partner had made to a local television station in Greece, which Hanick referred to as "the station which we will own."

20. In or about May 2015, Hanick relocated from Moscow to Greece to work primarily on the Greek TV Network, while continuing to work for the Russian TV Network as well. Shortly before the move, the Greek Business Partner wrote an email to Hanick stating that "Both K. and I want you in Greece."

21. Hanick primarily resided in Greece from in or about May 2015 through in or about February 2016. During that time, Hanick reported regularly to KONSTANTIN MALOFEYEV, the defendant, on his work on the Russian TV Network and the Greek TV Network, and routinely emphasized the corporate synergy between the two networks. In or about November 2015, Hanick wrote to MALOFEYEV that the Greek TV Network was an "opportunity to detail Russia's point of view on Greek TV," and emphasized "our vision of cooperation." Also in or about November 2015, Hanick wrote to MALOFEYEV that "In order to facilitate the synergy between media

10

holdings, [the Russian TV Network] and [the Greek TV Network] shall provide all resources possible to help each other achieve their goals."

## MALOFEYEV Employs Hanick in an Attempt to Acquire the Bulgarian TV Network

22. Beginning in or about January 2015, KONSTANTIN MALOFEYEV, the defendant, directed Hanick to assist in MALOFEYEV's efforts to acquire a Bulgarian television network (the "Bulgarian TV Network"). Publicly, the Greek Business Partner claimed to be the person who was attempting to acquire the Bulgarian TV Network, but MALOFEYEV directed Hanick to recruit the Greek Business Partner to falsely pose as the purchaser, even as both Hanick and the Greek Business Partner were privately working on MALOFEYEV's behalf to acquire the network.

23. In or about January 2015, Hanick wrote in an email that KONSTANTIN MALOFEYEV, the defendant, had "asked me to go to Bulgaria to see the station, evaluate the equipment, and personnel." The following day, Hanick sent an email to an employee of MALOFEYEV's investment company Marshall Capital Partners to ask if they had contacted the prospective business partner in Bulgaria (the "Bulgarian Business Partner"). Hanick explained that "I must see the station before [the Bulgarian Business Partner's] visit to

11

Moscow on Tuesday. . . . Konstantin needs this information from me."

24.  After visiting the Bulgarian TV Network station in Bulgaria on or about February 5, 2015, Hanick wrote a report of his visit to KONSTANTIN MALOFEYEV, the defendant, including Hanick's recommendation that the Russian TV Network begin producing Russian language programming to be broadcast on the Bulgarian TV Network. On or about February 16, 2015, Hanick wrote to the Greek Business Partner, explaining that Hanick was with MALOFEYEV, who wanted Hanick to travel to Bulgaria the next day "to deal with bank to buy Bulgaria tv and restructure loan." Hanick went on to explain that the Greek Business Partner should send someone to travel with Hanick to help to conceal MALOFEYEV's role in the acquisition: "He asked me to ask you if someone from your company could come with me to talk to the bank since we understand you cannot go. The buyer should not be Russian but Greek. . . . Please call me or Konstantin directly."

25.  In or about April 2015, Hanick wrote an email to update KONSTANTIN MALOFEYEV, the defendant, on the Bulgarian TV Network negotiations, outlining the structure of the proposed deal. MALOFEYEV responded "No. It is wrong. I told you the correct way to follow in my office." Hanick replied "Thank you, We will proceed as your plan!" About two weeks after this exchange, the Bulgarian police raided the Bulgarian TV Network station to seize

12

equipment on behalf of its creditor bank. The day after the raid, Hanick sent MALOFEYEV a translation of a Polish-language news article that apparently reported that MALOFEYEV was rumored to be the true financier of the Bulgarian TV Network deal, despite the Greek Business Partner purportedly being the buyer.

MALOFEYEV Employs Hanick to Transfer MALOFEYEV's Interest in
United States Property to the Greek Business Partner

26. In or about March 2014, KONSTANTIN MALOFEYEV, the defendant, made an investment of approximately $10 million to purchase shares of stock in a Texas-based bank holding company (the "Texas Bank" and the "Texas Bank Investment"). MALOFEYEV purchased his shares in the Texas Bank through a shell company incorporated in the Seychelles (the "Shell Company"). At the time he made the investment, MALOFEYEV's representatives provided the placement agent for the Texas Bank Investment with documentation showing that MALOFEYEV was the 100% ultimate beneficial owner of the Shell Company through various other corporate entities owned by MALOFEYEV. On or about March 31, 2014, the Texas Bank issued a certificate of shares listing the Shell Company as the owner of the shares.]

27. After OFAC designated KONSTANTIN MALOFEYEV, the defendant, as a SDN in December 2014, the Texas Bank filed a blocked asset report with OFAC regarding MALOFEYEV's beneficial ownership of the certificate of shares in the name of the Shell

Company.

28.   In or about March 2015, KONSTANTIN MALOFEYEV, the defendant, began making plans to transfer beneficial ownership of the Shell Company to the Greek Business Partner, due to a request by the Greek Business Partner for capital to deal with a cash flow problem in the Greek Business Partner's business. On or about March 17, 2015, an employee of MALOFEYEV emailed a Texas attorney who had assisted MALOFEYEV in making the Texas Bank Investment, regarding a plan to change the "owner from our side."

29.   In or about May 2015, an attorney employed by KONSTANTIN MALOFEYEV, the defendant (the "MALOFEYEV Attorney") exchanged several emails with an attorney employed by the Greek Business Partner (the "Greek Business Partner Attorney"), regarding a plan to draft and sign a Sale and Purchase Agreement to transfer ownership of the Shell Company from MALOFEYEV to the Greek Business Partner, which would have the effect of transferring ownership of the Texas Bank Investment, in violation of the Ukraine-Related Sanctions Regulations.

30.   On or about June 8, 2015, the Greek Business Partner sent an email to the MALOFEYEV Attorney, the Greek Business Partner Attorney, Hanick, and a Russian accountant employed by KONSTANTIN MALOFEYEV, the defendant (the "MALOFEYEV Accountant"), in which the Greek Business Partner explained that he planned to use the Texas Bank Investment as "collateral . . . to obtain a bank

guarantee covering the payments due." The next day, Hanick replied to the Greek Business Partner and the other recipients stating "I will wait in Moscow one more day for documents. I will return to Greece on Wednesday." The Greek Business Partner responded to Hanick instructing him to "be in touch with" the MALOFEYEV Attorney and the Greek Business Partner Attorney and "make sure all necessary documents will be handed over to you."

31.    On June 10, 2015, Hanick flew from Moscow to Athens. On June 15, 2015, the Greek Business Partner Attorney sent an email to the MALOFEYEV Attorney and the MALOFEYEV Accountant, confirming that the Greek Business Partner had received a "copy of the share certificate" in the Texas Bank, which Hanick had brought to the Greek Business Partner from Moscow.

32.    On or about June 9, 2015, KONSTANTIN MALOFEYEV, the defendant, signed a Sale and Purchase Agreement purporting to transfer ownership of the Shell Company to the Greek Business Partner in exchange for "USD 1.00 (One US dollar)." The Sale and Purchase Agreement was printed with a blank space for the date of the agreement, and a handwritten date was added that falsely indicated that the agreement was made in July 2014, rather than in June 2015. However, the registry of ownership of the Shell Company reflects that MALOFEYEV owned the Shell Company continuously from when it was created until June 2015, and ownership was not

transferred prior to that time.

        33.   On or about July 8, 2015, a representative of the
Texas Bank sent an email to the MALOFEYEV Attorney stating that
the Texas Bank Investment "constitutes 'blocked property'" because
KONSTANTIN MALOFEYEV, the defendant, had been listed as a SDN, and
that "as a result of this designation, Mr. Malofeev's property,
and interests in property, within the United States must be frozen,
and U.S. persons are generally prohibited from conducting any
transactions with Mr. Malofeev." On or about July 10, 2015, the
MALOFEYEV Attorney responded, asserting falsely that: "As far as
I know, the ownership over [the Shell Company] was transferred by
Mr. Malofeev to a third party (a new ultimate beneficial owner) at
the beginning of July 2014, i.e. before the SDN designation." In
truth, as MALOFEYEV and the MALOFEYEV Attorney well knew, the
transfer of the Shell Company was executed in June 2015, at
approximately the same time as Hanick physically delivered a copy
of the Texas Bank certificate of shares to the Greek Business
Partner and after the designation of MALOFEYEV as an SDN.

### Statutory Allegations

        34.   From at least in or about December 2014, up to and
including at least in or about December 2018, in the Southern
District of New York and elsewhere, KONSTANTIN MALOFEYEV, the
defendant, with others known and unknown, willfully and knowingly
did combine, conspire, confederate, and agree together and with

each other, to violate the IEEPA, in violation of 50 U.S.C. § 1705, Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

35. It was a part and an object of the conspiracy that KONSTANTIN MALOFEYEV, the defendant, and others known and unknown, would and did willfully and knowingly violate the IEEPA, and the regulations promulgated thereunder, to wit, MALOFEYEV and his co-conspirators willfully and knowingly caused United States persons to provide funds, goods, and services to and for the benefit of MALOFEYEV, whom OFAC had listed as a Specially Designated National, and to and for the benefit of companies owned and controlled by MALOFEYEV, and caused United States persons to receive funds, goods, and services from MALOFEYEV, and from companies owned and controlled by MALOFEYEV, and did and attempted to transfer, pay, export, withdraw, and otherwise deal in interests in property in the United States held by MALOFEYEV, without first obtaining the required approval of OFAC, in violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201, and engaged in and attempted to engage in transactions that evaded and avoided and caused a violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

(Title 50, United States Code, Section 1705; Executive Orders
13660, 13661, and 13662, and Title 31, Code of Federal
Regulations § 589.201)

17

## COUNT TWO

**(Violation of the International Emergency Economic Powers Act)**

The Grand Jury further charges:

36. The allegations set forth above in Paragraphs 1 through 33 are realleged and incorporated by reference as if set fully forth herein.

37. From at least in or about December 2014 through in or about December 2018, in the Southern District of New York and elsewhere, KONSTANTIN MALOFEYEV, the defendant, unlawfully, willfully, and knowingly violated the IEEPA, and the regulations promulgated thereunder, to wit, MALOFEYEV willfully and knowingly caused United States persons to provide funds, goods, and services to and for the benefit of MALOFEYEV, whom OFAC had listed as a Specially Designated National, and to and for the benefit of companies owned and controlled by MALOFEYEV, and caused United States persons to receive funds, goods, and services from MALOFEYEV, and from companies owned and controlled by MALOFEYEV, and did and attempted to transfer, pay, export, withdraw, and otherwise deal in interests in property in the United States held by MALOFEYEV, without first obtaining the required approval of OFAC, in violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201, and engaged in and attempted to engage in transactions that evaded and avoided and caused a violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

(Title 50, United States Code, Section 1705; Executive Orders 13660, 13661, and 13662, and Title 31, Code of Federal Regulations § 589.201)

## FORFEITURE ALLEGATION

38. As a result of committing the offenses alleged in Counts One and Two of this Indictment, KONSTANTIN MALOFEYEV, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Count One and Count Two, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

### Substitute Asset Provision

39. If any of the property described above as being subject to forfeiture, as a result of any act or omission of KONSTANTIN MALOFEYEV, the defendant,

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the court;

19

> d. has been substantially diminished in value;

or

> e. has been commingled with other property

which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United

States Code, Section 853(p); and Title 28, United States Code,

Section 2461 to seek

forfeiture of any other property of the defendants up to the value

of the forfeitable property described above.

> (Title 18, United States Code, Sections 981;
> Title 21, United States Code, Section 853;
> Title 28, United States Code, Section 2461.)


FOREPERSON

DAMIAN WILLIAMS
United States Attorney

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

-v.-

**KONSTANTIN MALOFEYEV**

**Defendant.**

**SEALED INDICTMENT**

S1 21 Cr. 676 (LAK)

(50 U.S.C. § 1705; Executive Orders 13660, 13661, and 13662; 31
C.F.R. § 589.201; 18 U.S.C. § 1001)

DAMIAN WILLIAMS
United States Attorney.

*Brian Coneely*
Foreperson.

Filed Superceding Indictment under seal.

4/4/22 An arrest warrant was issued.

DSMS Willis

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - X
  UNITED STATES OF AMERICA      :

            -v.-            :

ALL MONIES AND FUNDS CONTAINED IN :
OR TRACEABLE TO SUNFLOWER BANK,
N.A. ACCOUNT 1101996560, HELD IN  :
THE NAME OF "OFAC BLOCKED ACCOUNT
MALOFEYEV,"                :

          Defendant-in-rem.  :

- - - - - - - - - - - - - - - - - X

                                      WARRANT OF SEIZURE
                                      PURSUANT TO 18 U.S.C. §
                                      981

      TO:  ANY DESIGNATED OFFICER OF THE FEDERAL BUREAU OF
           INVESTIGATION AND/OR ANY LAW ENFORCEMENT OFFICER
           AUTHORIZED BY LAW

     An Affidavit having been made before me by Kenneth Wolf, a
Special Agent with the Federal Bureau of Investigation, that he
has reason to believe that the above-captioned funds are subject
to seizure and civil forfeiture pursuant to 18 U.S.C. § 981, and
as I am satisfied that there is probable cause to believe that
the property so described is subject to seizure and civil
forfeiture pursuant to 18 U.S.C. § 981;

     YOU ARE HEREBY COMMANDED AND AUTHORIZED to seize, within
fourteen (14) days of the date of issuance of this warrant, by
serving a copy of this warrant of seizure upon any person
presently in possession of the property described as follows:

a.   All monies and funds contained in or traceable to Sunflower Bank, N.A. account 1101996560, held in the name of "OFAC Blocked Account Malofeyev" (the "Target Property").

YOU ARE FURTHER COMMANDED AND AUTHORIZED to prepare a written inventory of the property seized and promptly return this warrant and inventory before this Court as required by law.

Dated:   New York, New York

_4/5/22_
Date Issued

_5:48_
Time Issued

_____

HONORABLE JENNIFER E. WILLIS
United States Magistrate Judge
Southern District of New York